IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SEAMUS H.[1] | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| FRANK BISIGNANO, | : | |
| Commissioner of Social Security[2] | : | NO.  24-6121 |

## MEMORANDUM AND ORDER

CAROLINE GOLDNER CINQUANTO, U.S.M.J.                    January 27, 2026

Plaintiff seeks review of the Commissioner's decision denying his applications for

Social Security Child Disability Benefits ("CDB") and Supplemental Security Income

("SSI").   For the reasons that follow, I conclude that the decision of the Administrative

Law Judge ("ALJ") is not supported by substantial evidence and recommend that the case

be remanded for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## I.    PROCEDURAL HISTORY

Plaintiff protectively filed applications for CDB and SSI on September 30, 2022,

alleging disability beginning on October 15, 2021, as a result of autism spectrum disorder

("ASD"), anxiety, depression, attention deficit hyperactivity disorder ("ADHD"), and

---

[1]Consistent with the practice of this court to protect the privacy interests of plaintiffs in social security cases, I will refer to Plaintiff using his first name and last initial.  See Standing Order – In re:  Party Identification in Social Security Cases (E.D. Pa. June 10, 2024).

[2]Frank Bisignano was appointed Commissioner of Social Security on May 6, 2025.  Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Mr. Bisignano should be substituted as the defendant in this case.  No further action need be taken to continue this suit pursuant to section 205(g) of the Social Security Act.  42 U.S.C. § 405(g).

insomnia.  Tr. at 104, 105-06, 114.[3]   His applications were denied initially on January

24, 2023, id. at 153-56 (CDB), 157-61 (SSI), and again upon reconsideration on June 22,

2023.  Id. at 163-66 (CBD), 167-70 (SSI).  On July 10, 2023, Plaintiff requested an

administrative hearing.  Id. at 171.  After holding a hearing on January 18, 2024, id. at

43-74, the ALJ issued an unfavorable decision on April 10, 2024.  Id. at 26-37.  The

Appeals Council denied Plaintiff's request for review on September 13, 2024, id. at 1-7,

making the ALJ's April 10, 2024 decision the final decision of the Commissioner.  20

C.F.R. §§ 404.981; 416.1481.  Plaintiff sought review in federal court on November 14,

2024, Doc. 1, and the matter is now fully briefed.  Docs. 11, 14, 20.[4]  The case was

originally assigned to my colleague, the Honorable Lynne A. Sitarski, and was reassigned

to me.  Doc. 15.[5]

## II.    LEGAL STANDARD

The court's role on judicial review is to determine whether the Commissioner's

decision is supported by substantial evidence.  42 U.S.C. § 405(g); Schaudeck v. Comm'r

of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999).  Therefore, the issue in this case is

whether there is substantial evidence to support the Commissioner's conclusion that

---

[3]Plaintiff filed prior unsuccessful applications for SSI and CDB in 2019.  Tr. at 78, 97.

[4]Pinpoint citations to the briefs in the case are to the court's ECF pagination.

[5]The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  See Standing Order – In Re: Direct Assignment of Social Security Appeals to Magistrate Judges – Extension of Pilot Program (E.D. Pa. Nov. 27, 2020); Docs. 3, 4.

Plaintiff is not disabled. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and must be "more than a mere scintilla." Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014) (quoting Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)); see also Biestek v. Berryhill, 587 U.S. 97, 103 (2019) (substantial evidence "means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'") (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The court has plenary review of legal issues. Schaudeck, 181 F.3d at 431.

To prove disability, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for . . . not less than twelve months." 42 U.S.C. § 423(d)(1). The Commissioner employs a five-step process, evaluating:

> 1.      Whether the claimant is currently engaged in substantial gainful activity;
>
> 2.      If not, whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to perform basic work activities that has lasted or is expected to last for a continuous period of 12 months;
>
> 3.      If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings"), 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;
>
> 4.      If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe

3

impairment, the claimant has the residual functional capacity
("RFC") to perform her past work; and

     5.    If the claimant cannot perform her past work,
then the final step is to determine whether there is other work
in the national economy that the claimant can perform.

See Zirnsak, 777 F.3d at 610; see also 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4).

Plaintiff bears the burden of proof at steps one through four, while the burden shifts to the

Commissioner at the fifth step to establish that the claimant is capable of performing

other jobs in the local and national economies, in light of his age, education, work

experience, and RFC. See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir.

2007).

    In addition, in order to obtain CDB, Plaintiff must show that he is entitled to

benefits "on the earnings record of an insured person who is entitled to old-age or

disability benefits or who has died…." 20 C.F.R. § 404.350. Plaintiff is entitled if he 1)

is the insured person's child, 2) is dependent upon the insured, 3) applies for benefits, 4)

is unmarried, and 5) is "18 years old or older and [has] a disability that began before

[Plaintiff] became 22 years old…." Id. § 404.350(a) (1-5).[6]

## III.   DISCUSSION

### A.   ALJ's Findings and Plaintiff's Claims

    In her April 10, 2024 decision, the ALJ first found that Plaintiff had not yet

attained age 22 on October 15, 2021, his alleged onset date. Tr. at 29. The ALJ then

---

[6]20 C.F.R. § 404.350(a)(5) creates other methods of qualifying for CDB, that are
not relevant to the present case.

began the five step analysis by finding at step one that Plaintiff had not engaged in

substantial gainful activity since October 15, 2021, his alleged onset date.  Tr. at 29.  At

step two, the ALJ found that Plaintiff had the following severe medically determinable

impairments of "[ASD], [ADHD], depressive disorder; generalized anxiety disorder;

paranoia, acute."  Id. at 29.  At the third step, the ALJ found that Plaintiff "does not have

an impairment or combination of impairments that meets or medically equals the severity

of one of the listed impairments…."  Id. at 30.  The ALJ found that Plaintiff has the

residual functional capacity ("RFC") to perform

> a full range of work at all exertional levels but with the
> following nonexertional limitations: can only have occasional
> interaction with supervisors and coworkers; no work
> involving shared tasks with coworkers, and no contact with
> the general public; work in a low stress job, defined as having
> only occasional decision making and only occasional changes
> in the work setting; can understand, remember, and carry out
> detailed but uninvolved written or oral instructions, but no
> assembly line work or work that requires hourly quotas, and
> this work should be as self-paced as possible, meaning any
> production requirements can be accomplished by the end of
> the workday or shift. He is also limited to a moderate noise
> environment, defined as a business office where typewriters
> are used, grocery store, department store, and light traffic.

Tr. at 32.

At the fourth step, the ALJ found that Plaintiff had no past relevant work.  Id. at

35.  Based on the Plaintiff's age, education, work experience, and RFC, a vocational

expert ("VE") testified that Plaintiff could perform the jobs of price marker, stock

checker, and garment folder.  Id. at 36.  As a result, the ALJ concluded that Plaintiff was

not eligible for SSI, because he was not disabled, and that Plaintiff was also not eligible

for CDB, because he was not disabled prior to March 13, 2022, his 22nd birthday.  Id. at

36-37.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence

because the ALJ (1) erroneously rejected the opinion of the treating nurse practitioner by

relying on factual misstatements about the record and cherry-picking from the

record, (2) erroneously rejected Plaintiff's statements about his condition as inconsistent

with his treatment records, (3) erroneously rejected Plaintiff's mother's statements as

inconsistent, due to factual and legal errors, (4) erred as a matter of law by not finding, at

step two, that Plaintiff's agoraphobia was medically determinable or severe, resulting in

an overestimation of Plaintiff's RFC and (5) failed to include all of Plaintiff's credibly

established limitations the hypothetical the ALJ presented to the VE.  Doc. 11 at 4-22.[7]

Defendant responds that the ALJ properly considered all medical opinions, testimony,

and third-party statements, and incorporated all of Plaintiff's credibly established

limitations in the RFC and in hypothetical questions to the VE.  Id. at 8-20.  In addition,

Defendant argues that the ALJ did not err at step two because the ALJ found other

impairments to be severe and considered Plaintiff's symptoms of agoraphobia when

formulating the RFC.  Doc. 14 at 6.  Plaintiff has filed a Reply.  Doc. 20.

---

[7]I have renumbered Plaintiff's claims, for ease of discussion.

**B.**    **Plaintiff's Claimed Limitations and Testimony at the Hearing**

At the administrative hearing, Plaintiff testified essentially as follows.  Plaintiff

was born on March 14, 2000.  Tr. at 70.  He completed the 12th grade.  Id.  Plaintiff was

not currently working, though he had worked in the past.  Id. at 52-53.  Plaintiff  was

diagnosed with ASD, ADHD, agoraphobia with panic disorder, and major depression.

Id. at 59.  Plaintiff did not drive, had never driven, and did not use mass transit.  Id. at 55.

His parents, with whom he lived, had driven him to the hearing.  Id. at 54-55.

Plaintiff experienced the following side effects from his medications: reduced

appetite from Concerta, id. at 55, occasional headaches from Valium, id., occasional

lightheadedness from his "morning medications," id., and headaches and brain fog in the

morning, from his nighttime dose of Seroquel.  Id. at 55, 57-58.[8]

Plaintiff's anxiety had worsened over time, which caused him to struggle with

understanding directions (including from his supervisors at his former job), with having

people around him, and with meeting deadlines.  Tr. at 53.  He had also begun

experiencing "pretty bad" paranoia, which made it difficult for him to leave his home,

including for "simple things like grabbing a[n] Amazon package…off [his] front step."

Id.  The paranoia had worsened following "numerous experiences," including an

---

[8]Concerta (generic name methylphenidate) is a central nervous system stimulant used to treat ADHD.  See https://www.drugs.com/concerta.html (last visited Dec. 31, 2025).  Seroquel (generic name quetiapine) is an atypical antipsychotic used to treat major depressive disorder in adults.  See https://www.drugs.com/seroquel.html (last visited Dec. 31, 2025).  Valium (generic name diazepam) is a benzodiazepine used to treat anxiety disorders.  See https://www.drugs.com/valium.html (last visited Dec. 31, 2025).

attempted break-in.  Id. at 53-54.  Plaintiff  had also been in a car accident with his father

the year before, which caused him increased anxiety about getting into a car, making it

more difficult for him to leave the house.  Id. at 54.  Plaintiff had taken Xanax and

Valium before the hearing, because he "had to be in the car."  Id. at 55.[9]  This was

recommended by Plaintiff's psychiatrist.  Id.  Plaintiff's anxiety and paranoia caused him

to struggle to talk to anyone with whom he was not familiar or who was not family,

which made it "really difficult" to form relationships with people.  Id. at 54.

　　　　Plaintiff was also having difficulty concentrating and staying on task, even when

using his medication.  Tr. at 54.  His parents helped him do chores because he had a

"very hard time" focusing on one task at a time.  Id. at 54.  Plaintiff had to repeatedly ask

his parents to repeat instructions for household chores, in order to remember "what [he

was] doing."  Id. at 61.  Plaintiff was not able to take care of his activities of daily living,

including cooking, cleaning, shopping, and laundry.  Id. at 56.  He was not able to cook

because he had difficulties following and focusing on the instructions.  Id.  Plaintiff also

could not use the microwave, because he was "not really allowed to use [it] anymore,"

due to him "routinely" "mess[ing] up" instructions and ruining microwave meals.  Id.

Plaintiff was also afraid to use the microwave because one of his brothers had "kind of

like blew it up in a sense when he was making food" and Plaintiff was afraid of making

the same mistake.  Id.  He did not need help showering or dressing, though his mother

---

[9]Xanax (generic name alprazolam) is a benzodiazepine used to treat anxiety
disorders, as well as panic disorders with or without agoraphobia.  See
https://www.drugs.com/xanax.html (last visited Dec. 31, 2025).

sometimes helped him pick out his clothes.  Id. at 56-57.  His father also helped him shave.  Id.

Plaintiff was prescribed Seroquel because he was "seeing things at night."  Tr. at 59.  He described this further as follows: "At night sometimes, if I face out into like my room, like the darkness of my room, I'll see typically like I guess you can describe it as just kind of like a big shadowy figure at times, or it can be like, just like a head.  Like I've had times where like I will see a person in my room."  Id. at 58.  This happened more than once a week and could last up to 15 seconds, before Plaintiff was able to "bring himself down like to earth in a sense."  Id.  He slept facing the wall to try to avoid these experiences.  Id. at 58-59.

Plaintiff experienced his autism symptoms as "kind of a combination of" his diagnoses.  Tr. at 59.  He felt very anxious and paranoid, and had a "very difficult time" talking to people, even his own family.  Id.  On his bad days, Plaintiff struggled to be around his own grandmother.  Id. at 59-60.  Plaintiff was often at home alone during the day, and would retreat to his room when his parents came home from work in the early evening, and remain there for the rest of the night.  Id. at 60.  He typically did not eat dinner with his parents, either going downstairs to get dinner himself or waiting for his mother to bring dinner to his room.  Id. at 61.  Plaintiff's autism also caused him to struggle with textures.  Id.  He could not wear brand new shirts, due to their stiffness, for example, because it "almost feels like… my skin's on fire."  Id.  When he wore something uncomfortable or touched certain textures, his anxiety spiked and he "kind of freak[ed] out."  Id.  Due to his issues with texture, he could not touch paper towels, bath

9

towels, rags, books, and paper.  Id. at 62.  Plaintiff also often wore the same clothes for

three or four days in a row, because his texture issues limited him to particular kinds of

clothing.  Id. at 68.   Plaintiff also was sensitive to noise, and wore noise cancelling

headphones with no music playing "basically all day," though he sometimes played white

noise or music.  Id. at 62.   Plaintiff wore two necklaces to fidget with and a knit cap, as

comfort items.  Id. at 62-63.  Plaintiff's hair was thinning, generally, which caused him

significant anxiety.  Id. at 67.  He wore a knit cap every day, including to the hearing,

with the ALJ's permission, to feel comfortable.  Id.  He owned a few knit caps, so that he

could wear one while the others were laundered.  Id. at 67-68. Plaintiff would

"unconsciously" pick at specific spots in his hair, which helped him "keep [his] mind off

of things if [he was] having a bad go of it."  Id. at 63-64.  The picking had caused a bald

spot on his chin and on the left side of his head.  Id.

Any physical touch, including hugging or shaking hands, made Plaintiff very

uncomfortable.  Tr. at 65.  It was "very, very rare" for Plaintiff to hug anyone, even his

parents, who were his "safe people."  Id.  Plaintiff hugged his parents maybe two or three

times a year, usually on their birthdays.  Id.  Plaintiff also paced "all day," despite his

plantar fasciitis, to the point that his feet were in pain and he wore holes into his socks.

Id. at 67.

Plaintiff's depression caused him to feel like a failure, that he was a burden to his

parents, that he was useless, and that he was "completely worthless."  Tr. at 64.  He had

suicidal thoughts at least twice a week on average, which increased to three or four times

in a particularly bad week.  Id.  Plaintiff had panic attacks three or four times a week,

even while in his home.  Id. at 65.  He had many triggers, including "something as small as just a little sound outside," potentially due to an attempted break-in "a couple of years" before.  Id.

On Plaintiff's worst days, he had no energy, remained in one room all day, and had frequent panic attacks.  Tr. at 66.  He felt depressed, constricted, claustrophobic, lightheaded, and as if he was "walled in."  Id.  Plaintiff would typically first ask one of his parents to stay home from work or come home early from work.  Id.  If his parents were not available, his brother or grandmother would come stay with him.  Id.  Plaintiff did not interact with them but was comforted by the knowledge that they were there.  Id. at 67.  Plaintiff had someone come stay with him two or three times a week.  Id. at 66-67.  On his worst days, Plaintiff typically would wake up and know that it was "going to be a really, really rough day," although he did have good days that were ruined by his triggers.  Id. at 66.

After the record was closed, Plaintiff asked to re-open to make one comment regarding his agoraphobia.  Tr. at 73-74.  Plaintiff stated that "[his] house is kind of almost like [his] own personal prison, in a sense" and that he really struggled to leave the house.  Id. at 74.  Though the VE had left the call, Plaintiff and his attorney did not believe they needed the VE to return for this testimony and the hearing closed immediately after.  Id. at 73.

A VE also testified at the hearing.  As Plaintiff had no past work, there was no testimony regarding the classification of his past work.  Tr. at 70.  Based on the hypothetical posed by the ALJ with the limitations included in the ALJ's RFC

11

assessment, see supra at 5, the VE testified that there would be work for such an

individual in the national economy, such as price marker, stock checker, and garment

folder.  Id. at 70-71.  The VE testified that there would be no jobs in the national

economy for this hypothetical person if he or she had the additional limitation of leaving

early, arriving late, or otherwise being absent four times per month, in addition to

regularly scheduled holidays and days off.  Id. at 71-72.  The VE also testified that

someone who is off task for more than nine percent of the day in a 90-day evaluation

period would be terminated, that the highest tolerance for absences is 1.5 days per month,

and that there is no tolerance for breaks beyond the normal morning, lunch, and afternoon

breaks.  Id. at 72.

### C.   **Medical Evidence Summary**

Plaintiff has a history of mental health impairments predating his current alleged

onset date of October 15, 2021.  In February 2020, Gyrid Lyon, Ph.D., performed a

consultative examination in connection with Plaintiff's previous applications.  Dr. Lyon

diagnosed Plaintiff with an unspecified anxiety disorder, unspecified depressive disorder,

and unspecified ASD.  Tr. at 859.  Dr. Lyon opined that Plaintiff had marked limitations

in all interaction abilities, specifically in his ability to interact appropriately with the

public, supervisors, and coworkers, as well as to his ability to respond appropriately to

"usual work situations" and to changes in a routine work setting.  Id. at 862.

John Laurence Miller, Ph.D., conducted another consultative examination in

November 2020.  During that exam, Plaintiff reported that he had a year of therapy in

2011, that he had been seeing a therapist twice a week for three years, and that he had

recently begun seeing a nurse practitioner.  Tr. at 877.[10]  Plaintiff also reported that he

had never been hospitalized for mental health.  Id.  Plaintiff stated that his symptoms

began in March of 2020.  Id.  He recounted recurring depressive episodes and anxiety-

related symptoms including "a phobic response to being out alone."  Id.  Plaintiff stated

that he had panic attacks three times a week and difficulty concentrating.  Id.  Dr. Miller

diagnosed Plaintiff with mild ASD, unspecified depressive disorder, and agoraphobia

with panic attacks.  Id. at 879.

On October 20, 2021, just after Plaintiff's alleged onset date, Plaintiff presented to

Yun Mi Kim, NP ("NP Kim") for a telehealth follow up visit regarding his continued

mental health issues.  Tr. at 1039.  Plaintiff complained that he had been feeling "numb,"

that he had recent passive suicidal ideation following the denial of his Social Security

claim, that he slept poorly, and that he was anxious and depressed.  Id. at 1041. Plaintiff's

mental status exam ("MSE") was normal, except for anxious mood. Id. at 1040.  Plaintiff

had diagnoses of moderate, recurring major depressive disorder ("MDD"), ADHD

inattentive type, autistic disorder, and generalized anxiety disorder.  Id. at 1042. NP Kim

found that Plaintiff's depression and ADHD were stable, but his anxiety was moderate.

Id. at 1040-41.  She recommended that Plaintiff continue his current medication regimen

---

[10]Plaintiff apparently continued to treat with his long-time therapist, Janelle Adair,
LPC, during the relevant period.  Per Plaintiff's counsel, Therapist Adair was unable to
provide an updated medical source statement or records because she was ill and was not
expected to recover.  Tr. at 48.  The record contains only records from Therapist Adair
that pre-date the relevant time period.  Id.  at 926-928, 929-1019.

of Remeron, Wellbutrin XL, and Buspar.  Id. at 1041.[11]  Plaintiff  had previously tried

Zoloft, Trintellix, Lorazepam, Concerta, and Ritalin.  Id. at 1040.[12]

Plaintiff began seeing NP Kim regularly monthly to every six weeks.  On

November 16, 2021, Plaintiff's MSE was normal except for anxious mood.  Tr. at 1043-

45.  On December 28, 2021, Plaintiff reported improved anxiety and depression, although

he continued to feel anxious in crowds.  Plaintiff's MSE was normal; however, Plaintiff

reported that he had been "hearing voices" saying his name, which had decreased in the

last few weeks.  Id. at 1047-48.[13]   On February 17, 2022,[14] Plaintiff reported that his

---

[11]Remeron (generic name mirtazapine) is an antidepressant used to treat MDD.
See https://www.drugs.com/remeron.html (last visited Dec. 31, 2025).  Wellbutrin XL
(generic name bupropion) is an antidepressant used to MDD and seasonal affective
disorder.  See https://www.drugs.com/mtm/wellbutrin-xl.html (last visited Dec. 31, 2025).
Buspar (generic name buspirone) is an anti-anxiety medication.  See
https://www.drugs.com/buspar.html (last visited Dec. 31, 2025).

[12]Zoloft (generic name sertraline) is an antidepressant.  See
https://www.drugs.com/zoloft.html (last visited Dec. 31, 2025).  Trintellix (generic name
vortioxetine) is an antidepressant used to treat MDD.  See
https://www.drugs.com/trintellix.html (last visited Dec. 31, 2025).  Lorazepam (brand
name Ativan) is a benzodiazepine used to treat anxiety disorders and insomnia caused by
anxiety or temporary situational stress.  See https://www.drugs.com/lorazepam.html (last
visited Dec. 31, 2025).  Ritalin (generic name methylphenidate) is a central nervous
system stimulant used to treat ADHD.  See https://www.drugs.com/ritalin.html (last
visited Dec. 31, 2025).

[13]The ALJ's opinion references a February 28, 2022 visit that matches the
description of this December 28, 2021 visit.  See tr. at 29.  The ALJ cited to full exhibit
numbers, without pinpoint citations to pages.  However, I am unable to locate any
February 28, 2022 visit in the entirety of the cited exhibits or in the record.

[14]The ALJ's opinion states that Plaintiff's "November 2021 through January 2022
mental status exams were normal except for an anxious mood at times."  Tr. at 29.  As
above, I cannot locate any January 2022 visits for Plaintiff in the record.  The report from
February 17, 2022, does state that Plaintiff appeared "not as sad and tearful as he was last

grandfather had passed away and that he was "upset about negative interactions with others," but that his mood was more stable and he felt "really good." Id at 1051. Again, Plaintiff's MSE was normal. Id. at 1052. On March 17, 2022, shortly after his 22nd birthday, Plaintiff reported to NP Kim that he was "in a funk" and felt sad and depressed for unidentifiable reasons, but that he was less anxious, more motivated, and sleeping better. Id. at 1054.

On May 26, 2022, Plaintiff reported to NP Kim that he suffered from increased anxiety and decreased depression. Tr. at 1057.[15] He felt he could not work at that time, "because of anxiety." Id. Plaintiff was also struggling with increased symptoms of ADHD, for which he was not medicated. Id. However, he was compliant with his existing medication regimen of Buspar, Remeron, and Wellbutrin. Id. at 1057-58. Plaintiff's MSE was within normal limits, besides anxious mood. Id. at 1058. NP Kim re-started Plaintiff on Concerta. Id. at 1059.

---

Monday." Id. at 1051. However, while I cannot locate any record for an additional appointment in February 2022, the Monday before February 17, 2022, was not in January. This issue will be addressed in full in my analysis.

[15]The ALJ's opinion describes this visit as follows: "May 26, 2022 records state the [Plaintiff] complained of increased anxiety. His focus and attention were intact. He stopped taking his medications. He was fidgeting and felt like his symptoms were out of control. His anxiety and depression improved. His mental status exam was within normal limits except for an anxious mood." Tr. at 29. There are two issues here, which will be addressed in full in my analysis. First, while the record states that Plaintiff had stopped taking his ADHD medication sometime in the past, the record is clear that he was compliant with his existing regimen for his depression and anxiety and that he had not stopped taking medication altogether. See id. at 1057-58. Second, the record contradicts the statement that his anxiety had improved. See id. at 1057-59. As the ALJ acknowledges, he reported an increase in anxiety. Id. at 29.

In July and August of 2022, Plaintiff reported to NP Kim that his focus had improved while taking Concerta; however, he also had increased depression and anxiety. Plaintiff's MSE with normal besides anxious mood.  See tr. at 1060-62 (July 18, 2022 – Psychiatric Progress Note), 1063-65 (August 26, 2022 – Psychiatric Progress Note).

On October 24, 2022, Plaintiff switched providers from NP Kim to Brittany Daurizio, PMHNP ("NP Daurizio").  Tr. at 1066.  Plaintiff reported to NP Daurizio that Concerta was effective and that he felt "the most organized he has ever felt."  Id. Plaintiff continued to complain of feeling anxiety and panic though his depression was improved.  Id.  Plaintiff reported that he often faced "difficulties or avoidance" leaving the house, that he feared socializing or being judged out in public, that he tried to avoid social or familial gatherings, and felt a sense of fear about leaving his home.  Id.  Plaintiff thought about joining the military, like his brothers, but concluded that if "[he] can't manage college course[s], [he]'d never be able to manage boot camp."  Id.  Plaintiff also informed NP Daurizio that he was not taking Remeron often, because it made him feel groggy in the morning.  Id.  Plaintiff's MSE was within normal limits, except for anxious mood and a restricted affect.  Id. at 1067.  During his second visit with NP Daurizio in December 2022, Plaintiff was diagnosed with agoraphobia without panic disorder.  Id. at 1119 (December 20, 2022 – Psychiatric Progress Note).

Over the next few months, Plaintiff continued to struggle with anxiety and agoraphobia.  Tr. at 1120-23 (February 10, 2023 – Plaintiff brought his mother to office visit for support, MSE findings of guarded and frustrated mood, restricted affect, scant and minimal speech, and disinterest, with limited progress toward goal of reducing

anxiety and fear when leaving the house.  NP Daurizio discontinued Remeron and Buspar, and started Plaintiff on Seroquel to treat his sleep and anxiety issues, as well as diazepam for severe anxiety and panic); 1126-29 (March 9, 2023 – feels more calm generally, but continues to experience panic attacks when going to the grocery store, anxiety is "high severity"), 1130-33 (April 5, 2023 – abnormal findings of anxious and frustrated mood, restricted affect, scant and minimal speech, and mildly impaired attention span on MSE), and 1134-38 (May 3, 2023 – abnormal findings of guarded and anxious mood, restricted affect, scant and minimal speech, and mildly impaired attention span on MSE).[16]

On May 31, 2023, Plaintiff reported feeling unmotivated and stuck, and that he often compared himself to his peers who were starting careers.  Tr. at 1139.  NP Daurizio reported that "he continues to wait until his SSI is approved and then he anticipates that he will begin to feel more independent as he will have a means of income."  Id.  She noted that "[d]espite [Plaintiff]'s fear of leaving the house, he feels disinterested and incapable of doing any type of remote or computer work to make money. [Plaintiff] says, 'my parents and therapists don't think I'll be able to manage a job, so I am going to wait for my SSI.'"  Id.  Plaintiff's findings on MSE were normal, besides apathetic mood, restricted affect, scant and minimal speech, and mildly impaired attention span.  Id. at 1141.  NP Daurizio found that Plaintiff's anxiety was "high severity."  Id.

---

[16]The ALJ's opinion states that Plaintiff's May 3, 2023 MSE was "normal other than mildly impaired attention span[.]" Tr. at 30.

Plaintiff continued to struggle with anxiety, frustration, and agoraphobia over the next several months.  Tr. at 1151-54 (June 28, 2023 – abnormal MSE findings of frustrated and angry mood, dysphoric and restricted affect, avoid gaze, scant and minimal speech, racing thoughts, and moderately impaired attention span, anxiety and depression assessed as "[m]oderate with exacerbation/side effects" and paranoia assessed as "high severity"), 1155-59 (August 28, 2023 – Plaintiff reports severe panic and fear when leaving the house, being in the car, and being in public places, feeling overstimulated, though mother reports improvements in depression, abnormal MSE findings of guarded mood, restricted affect, avoidant gaze, scant and minimal speech, guarded and unrevealing thought process, and moderately impaired attention span.  NP Daurizio continued Wellbutrin, Concerta, and Seroquel, increased diazepam, and began Prazosin for "hypervigilance/hyperarousal"),[17] 1160-64 (September 27, 2023 – abnormal MSE findings of guarded mood, restricted affect, avoidant gaze, scant and minimal speech, guarded and unrevealing thought process, and moderately impaired attention span).

On October 26, 2023, Plaintiff reported continued frustration, stemming from his constant feelings of anxiety.  Tr. at 1165.  He reported feeling startled by noises and by "seeing something out of the corner of [his] eye."  Id.  Plaintiff continued to panic when out in public or in the car.  Id.  Plaintiff had abnormal MSE findings of frustrated mood, flat affect, avoidant gaze, scant and minimal speech, guarded and unrevealing thought

---

[17]Prazosin (brand name Minipress) is a medication generally used to treat high blood pressure.  See https://www.drugs.com/mtm/prazosin.html (last visited Dec. 31, 2025).

process, and mildly impaired attention span.  Id. at 1167.  NP Daurizio recommended that Plaintiff begin an intensive outpatient program.  Id. at 1168.

During his November 13, 2023 visit, Plaintiff reported feeling uneasy at the thought of an intensive outpatient program, as he was uncomfortable meeting new people, starting with a new therapist, and discussing his history with them.  Id. at 1169. His MSE was normal, except for restricted affect, avoidant gaze, scant and minimal speech, guarded and unrevealing thought process, and mildly impaired attention span.  Id. at 1170-71.

On December 27, 2023, Plaintiff reported to NP Daurizio that he continued to try to get out of the house, but that the panic continued.  Id. at 1173.  His MSE had the abnormal findings of down and anxious mood, avoidant gaze, scant and minimal speech, guarded and unrevealing thought process, and mildly impaired attention span.  Id. at 1174-75.

On February 1, 2024, NP Daurizio completed a medical source opinion form and opined essentially as follows.  Tr. at 1178-80.  Plaintiff had a limited but satisfactory ability to understand, remember, and carry out short instructions, ask simple questions or request assistance, and adhere to basic standards of neatness and cleanliness.  Id. at 1178. Plaintiff was seriously limited in his ability to remember work-like procedures and to perform at a consistent pace without an unreasonable number and length of rest periods. Id.  Plaintiff was unable to meet competitive standards in maintaining attention for a two hour segment, sustaining an ordinary routine without special supervision, working in coordination with or proximity to others without being unduly distracted, making simple

work-related decisions, accepting instructions and responding appropriately to criticism from supervisors, getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, and dealing with normal work stress. Id. Plaintiff had no useful ability to function in the abilities and aptitudes of maintaining regular attendance and being punctual "within customary, usually strict" tolerances, completing a normal workday and workweek without interruptions from psychologically based symptoms, interacting appropriately with the general public, and responding appropriately to changes in a routine work setting. Id. Plaintiff had unlimited or very good ability to adhere to basic standards of neatness and cleanliness. Id. Plaintiff met with her every 6-8 weeks, which diminished the symptoms and signs of his mental disorders. Id. at 1179. Plaintiff had minimal capacity to adapt to changes in his environment or demands that were not already a part of his daily life, due to "symptoms associated with mental illness." Id. On average, Plaintiff's impairments or treatment would cause him to be absent from work more than three days a month. Id. at 1180.

On January 23, 2023, at the initial consideration stage, State Agency psychological consultant Kelly Lynne Roberts, Psy.D., completed her review of Plaintiff's records and opined essentially as follows. Tr. at 109, 112. Plaintiff had mild limitations in his ability to understand, remember, or apply information and moderate limitations to his abilities to interact with others; concentrate, persist, or maintain pace; and to adapt or manage himself. Id. at 108. Plaintiff could carry out very short and simple instructions, would not require special supervision to sustain a routine, could make simple decisions, could maintain socially appropriate behavior, could ask simple questions and accept instruction,

and could function in production-oriented environments requiring little independent decision making.  Id. at 111. Plaintiff had moderate limitations in sustained concentration and persistence, to his abilities to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to work in coordination with or in proximity to others without being distracted by them; and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Id.  Plaintiff had moderate social interaction limitations in his abilities to interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  Id.  Plaintiff also had moderate adaption limitations in his abilities to respond appropriately to changes in the work setting, travel to unfamiliar places or use public transportation and set realistic goals or make plans independently of others.  Id.

On June 21, 2023, at the reconsideration stage, State Agency psychological consultant Marci Cloutier, Ph.D., completed her review of Plaintiff's records, including updated treatment records through May 2023.  Tr. at 126-27.  Dr. Cloutier concurred with Dr. Roberts' findings, as described above.  Dr. Cloutier found Plaintiff had mild limitations in his ability to understand, remember, or apply information and moderate limitations to his abilities to interact with others; concentrate, persist, or maintain pace; and to adapt or manage himself.  Id. at 126.  Dr. Cloutier found that Plaintiff could carry out very short and simple instructions, would not require special supervision to sustain a

routine, could make simple decisions, could maintain socially appropriate behavior, could ask simple questions and accept instruction, and could function in production-oriented environments requiring little independent decision making.  Id. at 129.  Further, Dr. Cloutier made the same findings regarding Plaintiff's specific limitations in each category.  Id.

Plaintiff's mother submitted a third-party statement.  Tr.  at 582-89.  The statement is signed under oath and was last updated in November 2023. Id.[18]  Plaintiff's mother stated essentially as follows.  Plaintiff was born at 29 weeks gestational age, remained hospitalized for over two months, and was a "very sickly baby." Id. at 582.  He was unable to eat baby food, struggled with solid food, cried when dressed, and had weekly physical, occupational, and speech therapy visits until he was three.  Id.  Plaintiff had extra tutoring while in Catholic school, had an IEP when in public school, and found school very challenging.  Id. at 583.  While in high school, he was diagnosed with depression, anxiety, ADHD, and Asperger's.  Id. at 584.[19]  Plaintiff had a job as an assembly line worker but had panic attacks and struggled to understand directions.  Id. Plaintiff would pace to the point of getting blisters and cuts on his feet, picked at his hair enough to cause a bald spot, was startled easily, and had trouble making eye contact with her.  Id.  As of November 2023, Plaintiff was "completely removed from the outside

---

[18]I note that the ALJ stated that the statement was not under oath.  Tr. at 33.

[19]Asperger's syndrome is a previous categorization of ASD that is no longer in use.  See https://www.merckmanuals.com/professional/pediatrics/learning-and-developmental-disorders/autism-spectrum-disorder (last visited Dec. 31, 2025).

world," would not leave the house, feared being in cars, had increased depression and anxiety, and struggled to complete tasks at home.  Id. at 586-87.

### D.    Plaintiff's Claims

#### 1.    Opinion Evidence, Factual Misstatements, and Cherry Picking

Plaintiff argues that the ALJ erroneously rejected the opinion of the treating nurse practitioner, which, if credited, would have required the ALJ to find that Plaintiff met a Listing or was precluded from all work by his limitations.  Doc. 11 at 7-17.  Defendant responds that substantial evidence supports the ALJ's RFC determination, including the ALJ's consideration of the opinion evidence.  Doc. 14 at 8-13.

The ALJ's consideration of medical opinion evidence is governed by regulations which focus on the persuasiveness of each medical opinion.

> We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources.

20 C.F.R. §§ 404.1520c(a); 416.920c(a).

The regulations list the factors to be utilized in considering medical opinions: supportability, consistency, treatment relationship (including the length and purpose of the treatment and frequency of examinations), specialization, and other factors including familiarity with other evidence in the record or an understanding of the disability program.  Id. §§ 404.1520c(c); 416.920c(c).  The most important of these factors are supportability and consistency, and the regulations require the ALJ to explain these factors, but do not require discussion of the others.  Id. §§ 404.1520c(b)(2);

416.920c(b)(2).  The regulations explain that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . , the more persuasive the medical opinions . . .  will be."  Id. §§ 404.1520c(c)(1); 416.920c(c)(1).  In addition, "[t]he more consistent a medical opinion(s) . . .  is with the evidence from other medical sources and nonmedical sources . . . , the more persuasive the medical opinion(s) . . . will be."  Id. §§ 404.1520c(c)(2); 416.920c(c)(2).

The Third Circuit has held that "[t]he ALJ must consider all the evidence and give some reason for discounting the evidence she rejects."  Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (citing Stewart v. Sec'y HEW, 714 F.2d 287, 290 (3d Cir. 1983)).  When there is a conflict in the evidence, the ALJ may choose which evidence to credit and which evidence not to credit, so long as she does not "reject evidence for no reason or the wrong reason."  Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005); see also Plummer, 186 F.3d at 429 (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993)).  To allow for meaningful judicial review, an ALJ must articulate the basis for an unfavorable decision. 42 U.S.C. § 405(b)(1).

Plaintiff complains that the ALJ erred by favoring the opinions of Drs. Roberts and Cloutier, both non-examining record reviewers, over NP Daurizio, Plaintiff's treating nurse practitioner.  Doc. 11 at 7-17.  Defendant responds that the ALJ "was not only entitled to find these prior administrative medical findings more persuasive, but she sufficiently explained her reasons for doing so."  Doc. 14 at 12.

24

The ALJ found NP Daurizio's opinion only partially persuasive.

> On February 1, 2024, Brittany Daurizio, PMHNP, who treats the [Plaintiff] for his mental impairments, completed a medical source opinion check off form. She did not cite to any specific findings or examples in this opinion. She stated [the Plaintiff] has a limited but satisfactory ability to understand, remember, and carry out short instructions, ask simple questions or request assistance, and adhere to basic standards of neatness and cleanliness. He does not have any limitations in his ability to be aware of normal hazards and take appropriate precautions. The undersigned finds this portion of the opinion is persuasive. It is consistent with the [Plaintiff]'s treatment records and activities.

> She also opined the [Plaintiff] has serious limitations in his ability to remember work like procedures and perform at a consistent pace without an unreasonable number and length of rest periods. She also opined that the [Plaintiff] was unable to meet competitive standards in his ability to: maintain attention for two hour segments, sustain a normal routine without special supervision, work in coordination with or proximity to others without being unduly distracted, make simple work-related decisions, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes, and deal with normal work stress. He also has no useful ability to: maintain regular attendance and be punctual within customary, usually strict tolerances, complete a normal workday or workweek without interruptions from psychologically based symptoms, interact appropriately with the general public, and respond appropriately to changes in a routine work setting. She also opined that the [Plaintiff] had a minimal capacity to adapt to changes in his environment or to demands that are not already part of his daily life. She also opined that he would be absent from work more than three days per month due to his symptoms ([tr. at 1178-80]). The undersigned finds this opinion is only partially persuasive. The degree of limitations is not supported by or consistent with the treatment records from this provider, including his most recent visits ([id. at 1146-77]). The treatment notes show mostly normal mental status exams, and that the [Plaintiff] was not looking for

> remote work because he was waiting to receive SSI.  The
> treatment records do not document such severe limitations in
> social functioning, maintaining attention and concentration,
> and adapting or managing himself.

Tr. at 34.

Before analyzing the ALJ's consideration of the evidence, I note that "[t]he mere diagnosis of an impairment or presence of a disorder alone will not establish entitlement to benefits; rather the claimant must show how the alleged impairment or disorder results in disabling limitations."  Dietrich v. Saul, 501 F. Supp.3d 283, 296 (M.D. Pa. 2020) (citing Walker v. Barnhart, Fed. App'x 4223, 426 (3d Cir. 2006)).  Here, there is no question that Plaintiff suffered from multiple impairments.  The question is the degree of limitation these impairments imposed.

After carefully reviewing the record, I conclude that the ALJ's consideration of the opinion evidence, and ultimately the ALJ's RFC assessment, suffer from a fundamental flaw – the ALJ misread or mischaracterized the medical record in multiple instances.  For example, the ALJ wrote that Plaintiff's "November 2021 through January 2022 mental status exams were normal except for an anxious mood at times."  Tr. at 29.  The ALJ's reference to November 2021 through January 2022, encompasses only two visits to NP Kim – November 16, 2021 and December 28, 2021.  Tr. at 1043-46 (Nov. 16, 2021), 1047-50 (Dec. 28, 2021).[20]  Although the MSE for December 28, 2021 was normal, the treatment note indicates that Plaintiff was complaining of auditory

---

[20]These visits are a part of the few records between Plaintiff's alleged onset date and his 22nd birthday, which is the relevant time period for his CDB application.

hallucinations, id. at 1047-48, and NP Kim's MSE indicates that "[n]o hallucinations present at time of interview." Id. at 1049 (emphasis added).

Additionally, the ALJ indicates that the February 28, 2022 records state [Plaintiff] was less anxious and depressed." Id. at 29. As previously mentioned, there is no treatment note corresponding to February 28, 2022. However, it appears that the ALJ may be referring to the treatment note from December 28, 2021, which states that Plaintiff "is less anxious and depressed around the holiday season." Id. at 1047. However, this is also when Plaintiff was complaining of auditory hallucinations. Id. at 1047-48.

In recounting Plaintiff's treatment, the ALJ's discussion of Plaintiff's May 26, 2022 appointment with NP Kim contains an inconsistency and a gross mischaracterization of the evidence. The ALJ says Plaintiff "complained of increased anxiety," while simultaneously noting that "[h]is anxiety and depression improved." Tr. at 29. Plaintiff's anxiety had clearly not improved. The progress note is replete with indications that Plaintiff's anxiety had increased. See id. at 1057 ("Anxiety has been an issue," "Persistent worry. On edge and nervous"), 1058 (anxious mood on MSE).[21] In addition, after noting that Plaintiff "complained of increased anxiety, the ALJ states that Plaintiff "stopped taking his medications." Id. at 29. In context, it is clear that Plaintiff

---

[21]NP Kim routinely included notations on how Plaintiff rated his anxiety and depression on a 10-point scale. At the May 26, 2022 appointment, Plaintiff rated his anxiety as a 7, tr. at 1057, up from a 3 at his March 17, 2022 appointment. Id. at 1054. The only mention of depression in the progress note is Plaintiff's own rating of depression as a 3/10, id. at 1057, down from a 6/10 in March. Id. at 1054.

stopped taking his ADHD medication and was compliant with the treatment regimen for his depression and anxiety.  See id. at 1057 ("The patient is medication compliant," "The pt. dx'd with ADHD and he is not treated d/t 'I stopped all my medication.'").  Thus, the increase in anxiety was not a product of a failure to take medication.

There are additional mischaracterizations or misreadings with respect to more recent visits from May 2023.  The ALJ wrote that Plaintiff's May 3, 2023 MSE was "normal other than mildly impaired attention span."  Tr. at 30.  However, NP Daurizio's MSE on May 3, 2023, indicated a guarded and anxious mood, restricted affect, and "scant/minimal" speech.  Id. at 1135-36.  In addition, the progress notes indicate increased complaints of paranoia and anxiety, and feeling a "presence . . . hovering over his bed."  Id. at 1134.  Finally, the ALJ writes that, according to the May 31, 2023 record, Plaintiff "was disinterested in doing any type of remote work or computer work to make money and was waiting for his SSI."  Id. at 30.  Contrary to the ALJ's implication that Plaintiff was not interested in working because he was waiting for benefits, in context, Plaintiff did not believe he was capable of such work and hoped that the receipt of benefits would give him a sense of independence.

> [Plaintiff] reports that he continues to wait until his SSI is approved and then he anticipates that he will begin to feel more independent as he will have a means of income. Despite [Plaintiff]'s fear of leaving the house, he feels disinterested and incapable of doing any type of remote or computer work to make money.  [Plaintiff] says, "my parents and therapists don't think I'll be able to manage a job, so I am going to wait for my SSI."

Id. at 1139.  The ALJ's failure to acknowledge that Plaintiff felt both "disinterested and incapable" of working remotely makes it unclear if the ALJ was aware of the full statement.

As previously explained, the two most important factors in assessing medical opinion evidence are supportability – focusing on the objective medical evidence and supporting explanations provided by a medical source, and consistency – the extent to which the opinion is consistent with the record as a whole.  20 C.F.R. §§ 404.1520c(b)(2), (c)(1) & (2); 416.920c(b)(2), (c)(1) & (2).  When the ALJ errs in considering the records provided by medical sources, the court is hard-pressed to accept the ALJ's analysis concerning the supportability and consistency of any medical source's opinion.

Here, when the ALJ considered NP Daurizio's assessment, the ALJ specifically found that the limitations were "not supported by or consistent with the treatment records from this provider, including his most recent visits [(tr. at 1146-77)] [which] show mostly normal mental status exams, and that [Plaintiff] was not looking for remote work because he was waiting to receive SSI."  Id. at 34.  The MSEs to which the ALJ refers include notations of apathetic mood, restricted affect, "scant/minimal" speech, mildly impaired attention span, id. at 1148 (May 31, 2023); frustrated and angry mood, dysphoric and restricted affect, "scant/minimal" speech, moderately impaired attention span, id. at 1153 (June 28, 2023); guarded mood, restricted affect, avoidant gaze, "scant/minimal" speech, "guarded/unrevealing" thought process, moderately impaired attention span, id. at 1157 (Aug. 28, 2023); guarded mood, restricted affect, avoidant gaze, "scant/minimal" speech,

"guarded/unrevealing" thought process, moderately impaired attention span, id. at 1162
(Sept. 27, 2023); frustrated mood, flat affect, avoidant gaze, "scant/minimal" speech,
"guarded/unrevealing" thought process, mildly impaired attention span, id. at 1167 (Oct.
26, 2023); restricted affect, avoidant gaze, "scant/minimal" speech,
"guarded/unrevealing" thought process, mildly impaired attention span, id. at 1171 (Nov.
13, 2023); and a down and anxious mood, avoidant gaze, "scant/minimal" speech,
"guarded/unrevealing" thought process, mildly impaired attention span. Id. at 1174-75
(Dec. 27, 2023).  The ALJ's characterization of these MSEs as "mostly normal" is a
mischaracterization of evidence and not a proper basis for rejecting NP Daurizio's
opinion.  See Rutherford, 399 F.3d at 554 (ALJ may not reject evidence for "the wrong
reason").

### 2.    Remainder of Plaintiff's Claims

The remainder of Plaintiff's claims also hinge upon proper consideration of the
mental health treatment notes and the opinion evidence.  For example, the ALJ found
Plaintiff's statements about the intensity, persistence, and limiting effects of his
symptoms were inconsistent with the record because his MSEs were "mostly within
normal limits" and that he had appointments "when he was anxious, but these symptoms
are documented not to last." Tr. at 33.  As detailed above, the ALJ's consideration of the
mental health treatment records was flawed.  Thus, on remand, the ALJ should reconsider
Plaintiff' subjective complaints.  Similarly, the ALJ found Plaintiff's mother's third-party
statement unpersuasive, "[m]ost importantly" because it was not consistent with the
medical evidence.  Id.  Where, as here, the ALJ's review of the record may have been

"clouded" by error, "the most prudent course is to remand so that the ALJ can properly evaluate all the evidence." <u>Bynum v. Colvin</u>, 198 F. Supp. 3d 434, 438 (E.D. Pa. 2016).[22]

## IV.    <u>CONCLUSION</u>

The ALJ's decision is not supported by substantial evidence.  The ALJ mischaracterized the record and failed to properly consider NP Daurizio's statement.  It is unclear how these errors impacted ALJ's consideration of Plaintiff's impairments, the opinion evidence, Plaintiff's testimony, third party evidence, and the RFC assessment, for both the CDB and SSI claims.

An appropriate Order follows.

---

[22]Although the ALJ mentioned Plaintiff's diagnosis of agoraphobia with panic attacks, she did not include this as a severe impairment.  <u>Tr.</u> at 30.  It is unclear if, or to what extent, the ALJ considered limitations attributable to agoraphobia considering the Listings and crafting the RFC assessment.  I also note that the ALJ acknowledged "the longitudinal nature of [Plaintiff's] medically determinable impairments," and "reviewed the medical opinions dated prior to the relevant period.  <u>Id.</u> at 34.  One of those opinions was Dr. Lyon's opinion, which indicated that Plaintiff had marked limitations in all interaction abilities, <u>id.</u> at 862, providing support for the diagnosis of agoraphobia.